**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **YOLANDA JENKINS**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-1954-KSM** |
| **WESLEY ENHANCED LIVING, et al.**, | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                                                      **June 27, 2024**

Plaintiff Yolanda Jenkins brings employment discrimination claims[1] for failure to promote and hostile work environment under state and federal law against her former employer, Wesley Enhanced Living ("WEL"), and the WEL living communities where she worked, Stapeley Hall and Stapeley Hall, Inc. (herein referred to collectively as "Defendants"). Defendants moved for summary judgment, arguing that Jenkins failed to put forth evidence showing that the case should proceed to trial. (Doc. Nos. 25, 28.) Jenkins responds that fact disputes preclude entry of summary judgment. (Doc. Nos. 26, 29.) The Court held oral argument on Defendants' motion on June 18, 2024. (Doc. No. 33.) For the reasons that follow, the Court grants in part and denies in part the Motion.

---

[1] At oral argument, Jenkins agreed that she was not pursuing a constructive discharge claim but asserted that the circumstances of her resignation are part of the damages based on her hostile work environment claim. (Draft Hr'g Tr. at 31:4–12.)

I.      **FACTUAL BACKGROUND**

Viewing the evidence in the light most favorable to Jenkins, the relevant facts are as follows.

WEL is a Continuing Care Retirement Community ("CCRC") comprised of five senior living communities—including locations in Stapeley, the Main Line, and Doylestown—which provide various combinations of independent living, personal care, memory care, rehabilitation, and skilled nursing services.  *See About*, Wesley Enhanced Living (last accessed June 17, 2024), https://www.wel.org/about-us/.  WEL's President and CEO is Jeffrey Petty, a white male.  (Doc. No. 28 at ¶ 17.)  Each WEL community is run by an Executive Director with a Pennsylvania Nursing Home Administrator license ("ED/NHA")[2], who directly reports to Petty.  (*Id.* at ¶ 21; Doc. No. 26-7 at 56:5–18.)  Petty joined WEL as its President and CEO in 2003; since then, all fifteen to twenty ED/NHAs employed at WEL have been white.  (Doc. No. 28 at ¶ 21.)

A.      **Jenkins Begins Employment at WEL**

Ms. Jenkins, a black woman, was hired on July 16, 2017 by WEL's then-Vice President of Human Potential, Patricia Lamoreux, a white woman, to be the Human Resources ("HR") Manager for WEL's Stapeley community.[3]  (Doc. No. 28 at ¶ 13; Doc. No. 26-4 at 52:8–15.)  Jenkins has a bachelor's degree in human resources management, a master's degree in human resources development, with a concentration in financial management, and obtained her New Jersey NHA License in 1992.  (Doc. No. 28 at ¶¶ 1, 4.)  She also had prior experience working at

---

[2] One WEL community does not have a nursing home, so the director of that community is referred to as an Executive Director ("ED"), rather than ED/NHA.  (Doc. No. 26-7 at 56:5–18.)

[3] At the time Lamoreux hired Jenkins, there was little racial diversity in HR management.  (Doc. No. 28 at ¶ 19.)  Lamoreux testified that in her seven years as WEL's Vice President of Human Potential, almost every employee who reported to her was white.  (*Id.*)

a CCRC and as a Nursing Home Administrator ("NHA"); however, starting in 2005, Jenkins

stopped working as an NHA and transitioned to HR-focused roles.[4]  (*Id.* at ¶ 3; Doc. No. 26-4 at

19:1–20:16, Doc. No. 26-5 at 2–4.)  Jenkins discussed her NHA background during the interview

process for HR Manager.  (Doc. No. 28 at ¶ 14; Doc. 26-12 at 179:19–181:5.)

As Stapeley's HR Manager, Jenkins reported to Lamoreux and had a "dotted line"

relationship with Stapeley's ED/NHA, Ken Beiler, a white male.[5]  (Doc. No. 28 at ¶¶ 17, 18.)

Jenkins's HR duties included guiding management strategies toward continuous improvement of

HR-related initiatives, employee growth and development; ensuring that local leaders,

management, and employees had effective accessible HR advice, guidance and solutions;

providing guidance to supervisors and managers in resolving employee relations issues;

supervising and developing HR assistants; partnering with EDs and community managers to

execute employee development strategies; and developing or participating in the implementation

of department policies and procedures that guided and supported the quality care and services

provided by WEL.  (*Id.* at ¶ 15.)  Jenkins was responsible for supervising one individual in her

role as HR Manager.  (Doc. No. 26-4 at 59:6–21.)

### 1.    Jenkins's 2018 Performance Development Review

On August 20, 2018, Jenkins met with Lamoreux for her first annual performance

development review.  (Doc. No. 28 at ¶ 34.)  Lamoreux, who had received input from Beiler,

(Doc. No. 26-7 at 120:16–121:1), gave Jenkins a positive review.  (Doc. No. 28 at ¶ 34.)  The

---

[4] To the extent Defendants state they "cannot [] admit or deny . . . testimony" by Jenkins that she worked
at several CCRCs and trained in every area of their CCRCs (*see* Doc. No. 28), the Court finds that this
fact is undisputed for purposes of the summary judgment motion.  *See* Fed. R. Civ. P 56(c), (e).

[5] Lamoreux explained that the "dotted line" relationship indicated that Jenkins worked as a department
head in the Stapeley community headed by Beiler.  (Doc. No. 26-12 at 161:9–16.)

written evaluation stated that Jenkins "[d]emonstrated very good employee relationship and team building" and "[s]he continuously brings new ideas for improving the culture and developing the skills of both leadership and employees." (Doc. No. 26-15 at 2.)

During the evaluation, Lamoreux and Jenkins discussed Jenkins's prior experience as a licensed NHA in New Jersey and that Jenkins had previously overseen and controlled the operations of various CCRCs. (Doc. No. 28 at ¶ 35.) Jenkins informed Lamoreux that despite her recent HR-focused roles, her future goals included obtaining her Pennsylvania NHA license and one day becoming an ED/NHA at WEL. (*Id.*) Although the ED/NHA role includes some HR duties, it also encompasses many more duties and responsibilities. (*See* Doc. No. 26-16 (ED/NHA job description which includes, among others: recommending policies to Executive Staff and administering approved policies and directives to enhance administration and operations; collaborating with the CEO and Finance Department to prepare annual operating and capital budgets; implementing guidelines established by the Property Committee to delegate responsibility to the facilities manager ensuring that the physical property is kept in good condition; assuming responsibility for the overall operation of the Health Care Center to ensure full compliance with applicable licensing requirements; developing ongoing marketing strategies; and meeting with residents individually and collectively to interpret policies, maintain positive relationships, and address any concerns).) The ED/NHA is also responsible for supervising multiple individuals. (*See, e.g.*, Doc. No. 26-7 at 53:23–54:4, 75:18–76:7 (Beiler testifying that he has nine employees who directly report to him); Doc. No. 26-12 at 82:10–19 (Lamoreux testifying that an ED/NHA at WEL oversees not only the nursing home, but also "assisted living . . . the ancillary departments surrounding that community, independent living,

budgeting . . . dining, environmental services such as housekeeping, maintenance, activities, [and] therapy").)

Lamoreux was supportive of Jenkins's stated goals and informed her that she believed several ED/NHAs at WEL were preparing to retire over the next five years.  (Doc. No. 26-4 at 81:6–19; *see also* Doc. No. 26-12 at 190:3–16 (Lamoreux testifying, "I encouraged her [] to do what she needed to do to become an executive director at Wesley, yes.  Q: Didn't you discuss during that meeting with her in August of 2018 that certain employees in the ED/NHA positions at WEL were nearing retirement and there would be openings in those positions over the next five years?  A: I don't recall saying it, but I probably shared that because that, there were a couple of people that were going to retire, yes.  Q: Okay. So you could have said that?  A: Yeah, sure.").)

The day after learning of Jenkins's goal of becoming an ED/NHA at WEL, Lamoreux emailed Petty to inform him of Jenkins's interest.[6]  (Doc. No. 28 at ¶ 64; Doc. No. 26-19 at 2.)  Lamoreux explained that Jenkins held NHA licenses for the states of New Jersey and Virginia and was working towards obtaining her Pennsylvania license.  (Doc. No. 26-19 at 2.)  Lamoreux further stated that she had told Jenkins to share her goal of becoming an ED/NHA with Beiler, Stapeley's current ED/NHA, and to ask him for opportunities to demonstrate her readiness for the role.  (*Id.*)  She concluded her email to Petty, "[j]ust want you to be aware so you can discuss with [Beiler]."  (*Id.*)

In addition to emailing Petty, Lamoreux testified that she also connected Jenkins with Beiler and another ED/NHA so she could learn more about the functions of an ED/NHA.  (Doc.

---

[6] Lamoreux testified that this email demonstrated her implicit support for Jenkins's goal (Doc. No. 26-12 at 198:24–199:14), but Petty testified that he did not perceive Lamoreux's support for Jenkins based on the text of her email (Doc. No. 26-13 at 77:20–78:10).

No. 26-12 at 191:18–194:16; *see also* Doc. No. 26-4 at 162:18–165:16 (Jenkins testifying

regarding email from Beiler to the Stapeley Director of Nursing informing him of Jenkins's

participation in interdisciplinary care planning meetings); Doc. No. 26-7 at 137:4–139:24 (Beiler

testifying that Jenkins accompanied him to some morning meetings where she learned more

about the daily functions of the nursing home); Draft Hr'g Tr. at 25:1–4 (Jenkins's counsel

conceding, "[i]t is in the record that I think sporadically she attended some NHA meetings").)  In

addition, Lamoreux sought to help Jenkins develop and grow by working with her to understand

finances and develop a budget for her own department.  (Doc. No. 26-12 at 258:22–259:1.)

### 2. Jenkins Experiences Different Treatment

Despite Lamoreux's initial encouragement during her performance review, Jenkins

alleges that soon after expressing her interest in the ED/NHA position, Lamoreux began treating

Jenkins differently and worse during monthly HR meetings by interrupting and cutting Jenkins

off from speaking during group discussions.  (Doc. No. 28 at ¶ 56.)  Whether this treatment

occurred is disputed in the record.  Althea Taylor (Crockett), a former black HR manager, stated

that she observed such mistreatment.[7]  (Doc. No. 30.)  Taylor stated that she noticed Lamoreux

would interrupt Jenkins "in a very harsh manner" during HR meetings and seemed to take issue

with Jenkins's input, while she found Lamoreux "to be very gentle and accepting of any all ideas

that were shared by the white Human Resources Managers, even if those ideas were not helpful

or showed a lack of experience."  (*Id.*)  Lamoreux denied any recollection of such unfair

treatment; she noted that she did redirect people during HR meetings to facilitate conversation,

but that she would not cut people off.  (Doc. No. 26-12 at 148:11–18; 153:1–8.)  Lamoreux also

testified that Jenkins was "very repetitive when she talked and would state things and continue to

---

[7] *See infra* n.30.

talk and then say it again and say it again." (*Id.* at 153:1–8.)  Cara Kuhn, then-Director of Talent

Acquisition, regularly attended the monthly HR meetings and testified that Lamoreux would cut

short all employees in facilitating HR group discussions but denied witnessing Lamoreux being

critical of Jenkins.  (Doc. No. 26-11 at 49:20–50:7, 188:9–12.)  Kuhn did not have any issues

with Jenkins's manner of speaking and did not think that Jenkins talked too much.  (*Id.* at 51:2–

9.)  Rather, Kuhn testified that Jenkins was articulate and that she found Jenkins's contributions

helpful during discussions.  (Doc. No. 28 at ¶ 62; Doc. No. 26-11 at 50:13–20.)

### 3.     Jenkins's 2019 Performance Development Review

A year later, on July 18, 2019, Jenkins again received overall positive feedback during

her 2019 annual review, although her review did include a comment by Beiler about her

speaking style, noting, "[t]here are situations on occasion where [Jenkins's] message might be

better heard if it was distilled down to the essence ie. The old []adage 'less is more.'"[8]  (Doc. No.

26-22; Doc. No. 28 at ¶ 84.)  Jenkins informed Lamoreux during her annual review that she now

had her Pennsylvania license as of March 2019.[9]  (Doc. No. 26-22 at 2; Doc. No. 26-13 at

111:18–112:14.)  They again discussed Jenkins's goal of becoming an ED/NHA at WEL, and

Lamoreux updated Jenkins's written review to reflect she had obtained her Pennsylvania license

and had continued interest in becoming an ED/NHA at WEL.  (Doc. No. 26-22 at 2.)

---

[8] Beiler also noted that on rare occasion, Jenkins could be "so fully vested in an issue" that she could be "resistant to an alternative solution," but Lamoreux specifically rebutted this comment, stating that she believed "this is tied to a single event where [Jenkins] was trying to [en]sure the process and procedures were administer[ed] correctly, fairly and consistently without any favoritism."  (Doc. No. 26-22 at 3.)

[9] Because Jenkins already had her NHA license in New Jersey, she was able to apply for a reciprocal license in Pennsylvania.  WEL paid the fees associated with Jenkins obtaining her Pennsylvania NHA license.  (Doc. No. 28 at ¶ 44; Doc. No. 26-13 at 111:18–112:14.)

Lamoreux also informed Jenkins that there were no available openings for ED/NHA positions at WEL at the time.  (*Id.*)  Just one month prior to the review, in June 2019, Michael DeStefon, a white male and WEL's previous Corporate Director of Rehabilitation Services, had obtained his Pennsylvania NHA license and taken over as ED/NHA for WEL's Main Line location.  (*See* Doc. No. 25-9; Doc. No. 26-20 at 74:12–75:24.)  DeStefon testified that Petty had originally approached him about becoming the ED/NHA for Main Line sometime by early 2018[10] and that he had started to complete the requirements to obtain his NHA license by September 2018.[11]  (Doc. No. 26-20 at 67:14–68:1, 75:5–11, 91:9–92:13; Doc. No. 28 at ¶ 67; Doc. No. 25-9.)

### 4.    Jenkins's Continued Employment in 2020 and 2021

It is undisputed that Lamoreux did not meet with Jenkins to conduct an annual review in 2020 or 2021.  (Doc. No. 28 at ¶ 85.)  Regarding the 2020 review, Lamoreux testified that she may have missed some performance reviews due to a combination of the pandemic and her breast cancer treatment.[12]  (Doc. No. 26-12 at 136:11–21, 166:9–14, 262:6–10.)  And as to the 2021 review, Lamoreux testified that she was "getting ready" to complete Jenkins's 2021 performance review but did not complete it because when she reached out to Beiler for his input,

---

[10] Although Jenkins was unaware of DeStefon becoming Main Line's ED/NHA until 2021 (Doc. No. 26-4 at 226:5–9), Kuhn testified that she had been aware that Petty had a succession plan for this position as early as 2016.  (Doc. No. 28 at ¶ 81; Doc. No. 26-11 at 8:7–10, 12:15–17, 26:7–15.)

[11] Although the record reflects some inconsistency regarding DeStefon's start date as the ED at the Main Line facility, (*see* Doc. No. 26-20 at 48:1–24, 52:20–53:4, 58:24–61:16, 64:3–65:14, 77:23–78:4, 109:14–110:11; Doc. No. 27; Doc. No. 26-27 at 6), DeStefon testified that he began serving as the ED for the Main Line facility either in March or June 2018, prior to obtaining his NHA license.  (Doc. No. 26-20 at 60:24–61:16, 77:23–78:4, 91:9–92:13.)  Then, in June 2019, after DeStefon received his Pennsylvania NHA license, he was immediately transitioned to the ED/NHA position for the facility.  (Doc. No. 28 at ¶¶ 73, 74.)

[12] Lamoreux testified that she was receiving chemotherapy and radiation treatments from approximately March through September 2020.  (Doc. No. 26-12 at 136:15–19, 146:23–147:9.)

Beiler asked her to "put a pause" on the performance review because he "need[ed] to discuss something with [Lamoreux]." (*Id.* at 262:6–263:9.)

Jenkins also testified that Lamoreux missed or canceled most of Jenkins's monthly remote teleconference one-on-one meetings with her, even though she claimed Lamoreux regularly met with her white direct reports. (Doc. No. 26-4 at 106:7–109:7.) Jenkins testified that she only had one one-on-one meeting with Lamoreux in 2021. (*Id.* at 107:9–15.) Lamoreux conversely testified that she "didn't always meet during COVID and . . . when [she] was having [her] cancer treatments [she] wasn't meeting with people regularly." (Doc. No. 26-12 at 146:16–148:6.)

Despite not having any formal performance reviews since the summer of 2019, on March 29, 2021, Beiler wrote a letter of reference for Jenkins to the New Jersey Department of Health Nursing Home Administrators Licensing Board.[13] (Doc. No. 28 at ¶ 126.) Beiler stated that he had "known and worked with [Jenkins] for almost four years and can vouch for her character, high standards both professionally and morally, and dedication to her profession." (*Id.*) He also wrote, "[a]s her supervisor, I find [Jenkins] to be extremely knowledgeable, thorough, and with a great attention to detail. As her co-worker, I look to [Jenkins] on a number of subjects, including employee relationship and job satisfaction, and legal issues." (*Id.* at ¶ 127.)

## B.   WEL Doylestown ED/NHA Job Opening

On March 8, 2021, a job post for WEL's Doylestown ED/NHA position was opened. (*Id.* at ¶ 87.) The job application required (1) "Related Experience" which included, among other similar items, "[s]uccessful implementation of redesign of program operations, strategic

---

[13] At oral argument, Jenkins's counsel clarified that this letter of recommendation was needed for purposes of renewing Jenkins's New Jersey NHA license. (Draft Hr'g Tr. at 10:17–23.)

planning, expansion of services, and/or development of service models within a Personal

Care/Assisted Living, SNF, or CCRC model" (2) a college degree and (3) a Pennsylvania NHA

license, with master's degree in a related field preferred.[14]  (Doc. No. 26-16 at 4.)  Petty was

responsible for choosing the ED/NHA candidate (Doc. No. 28 at ¶ 22), but Lamoreux and Kuhn

helped screen the applicants (Doc. No. 26-11 at 97:17–23).[15]  Despite knowing of Jenkins's

interest in an ED/NHA position since July 2018, Lamoreux and Petty did not discuss Jenkins as a

potential internal candidate prior to posting the opening.  (Doc. No. 28 at ¶¶ 88, 94.)

On May 16, 2021, more than two months after the post opened, Jenkins applied for the

ED/NHA position, and on May 17, 2021, informed Lamoreux of her application via email.[16]

(Doc. No. 26-23 at 2; Doc. No. 28 at ¶ 97; Doc. No. 26-24 at 2.)  Lamoreux replied to Jenkins

the same day and explained that she believed Jenkins had applied too late.  (Doc. No. 26-24 at 2.)

She stated that Petty was in the final stages of interviewing and was ready to make an offer.  (*Id.*)

She also stated that Petty was looking for an experienced ED/NHA that had recent CCRC

environment experience as an ED/NHA, but that if Petty did not move forward with the current

candidate, it would be worth interviewing with Petty if he felt she had the "experience he is

looking for."[17]  (*Id.*)

_____

[14] The Qualifications section of the ED/NHA job post also listed a number of interpersonal skills, such as "[o]rganizational development and leadership skills."  (Doc. No. 26-16 at 4.)

[15] Lamoreux, a member of WEL's C-suite, was also involved at the final stages of choosing an applicant when Petty sought input from the C-suite.  (Doc. No. 26-12 at 85:1–16.)

[16] Jenkins included a note in her email to Lamoreux that she "do[es] have some mix[ed] feelings about [the position], but not related to [her] ability to perform the job."  (Doc. No. 26-24 at 2.)  Jenkins testified that she included this note because she was concerned about the levels of diversity at the Doylestown community.  (*Id.* at 228:18–229:15.)

[17] Lamoreux testified that she was unaware that Jenkins had worked at several CCRCs before she applied for the ED/NHA position in 2021.  (Doc. No. 28 at ¶ 101.)

On May 24, 2021, after interviewing Petty's potential candidate, a white female, Lamoreux gave Petty her underwhelming impression of the candidate.  (Doc. No. 26-25 at 3.)  In the same email string, Lamoreux informed Petty that Jenkins had also applied for the position but stated that she had "[a]dvised [Jenkins] that she was late in applying and we have narrowed down the candidates."  (*Id.* at 2.)  Upon learning that Jenkins had applied, Petty immediately responded, "[w]e need to discuss with her that she is not an ED candidate.  Otherwise this will fester and cause heartburn."  (*Id.*)  Petty testified that even though he had learned of Jenkins's interest in becoming an ED/NHA at WEL in August 2018, he never considered her for that role because based on his limited interactions with Jenkins, he did not think she could communicate effectively or lead people, and she did not have a business sense.[18]  (Doc. No. 26-13 at 94:18– 95:17 (in response to a question asking what qualities of an executive director Petty felt Jenkins lacked, Petty testifying, "I did not believe she could lead people.  I did not believe she had a business sense. . . . [S]he could not answer basic questions in a way I could understand them."); *see also id.* at 97:12–99:2 (Petty testifying that Jenkins "did not have the ability to communicate clearly").)  Petty also stated that based on his limited interactions with Jenkins,[19] he had found

---

[18] At the same time Petty stated he would never have considered Jenkins for the role, Petty also blamed Jenkins for not approaching him about her interest in the ED/NHA role.  (*See* Doc. No. 26-13 at 87:15–20 ("[Jenkins] would need to work with me as well, which goes back to her approaching me with her interest.  If she can't come to me and approach me that she has an interest, she is not going to be a very effective executive director."); *id.* at 89:1–10 ("Q: So is it up to the employee if they are interested in executive director to come talk to you and you don't help them– A: Of course– Q: –at all on your own; right?  A: Of course I help them. . . .  The point is they need to have the initiative to start the process."); *id.* at 90:4–12 ("Q: But [working with Beiler to develop Jenkins's skills] wasn't enough, right, because she needed to come to talk to you, that was in your mind, right that she didn't come to talk to you?" A: She would need to come to talk to me at some point.  Q: Okay. And you never verbalized that to Miss Lamoreux or to Miss Jenkins; right?  A: No.").)  Ironically, DeStefon testified it was Petty who first mentioned the idea of DeStefon becoming an ED/NHA.  (Doc. No. 26-20 at 68:17–20.)

[19] Jenkins similarly testified that she had limited interactions with Petty during her four years at WEL. (Doc. No. 26-4 at 237:5–19 (Jenkins testifying that she never had a one-on-one conversation with Petty and never had a direct conversation with Petty during group meetings); *see also* Doc. No. 26-11 at 64:2–

her responses to his questions to "be very difficult for [him] to understand" and not "explained [. . . ] in a way that [he] could absorb the information." (Doc. No. 28 at ¶ 46; s*ee* Doc. No. 26-13 at 70:24–71:17, 150:9–18 (Petty testifying that he did not get the chance to work with Jenkins "in great depth" and that he did not "recall much individual one-on-one interaction," but that he interacted with her when he would "routinely meet with both the HR group in the HR meetings, as well as . . .  monthly worker's compensation claim review meetings. . . . So [he] would interact with her largely as part of those group settings" "anywhere from five minutes to . . . a couple hours").) He continued, "even if I had known about her previous employment, which I might have, it wouldn't have overridden my impression of her" regarding her ability to communicate and lead people. (Doc. No. 26-13 at 146:6–17.)

In continuing the email conversation with Petty about Jenkins's application, Lamoreux told Petty that she would "talk with" Jenkins and Ken Beiler, who was "very supportive and encouraging" of Jenkins. (Doc. No. 26-25 at 2.) Petty responded that he wasn't aware that Beiler had been "promoting" Jenkins, and questioned Lamoreux if she was sure of this fact. (*Id.*) Lamoreux replied, "[Beiler] has been encouraging her to attend [and] participate in workshops/webinars for NHA's with him. [Jenkins] did not specifically say that [Beiler] told her to apply. I can talk with [Beiler] to get a better read on that." (*Id.*)

On June 18, 2021, Lamoreux met with Jenkins to discuss the position, which remained open[20] and told her that she was not a candidate for the Doylestown ED/NHA position because she had never worked in a CCRC, was a newly licensed NHA, and did not have a strong

---

[19] (Cara Kuhn, then-Director of Talent Acquisition, testifying that when Petty joined the meetings, "it was usually pretty brief," and that she did not "recall him ever being there for the entire meeting").)

[20] The candidate Petty originally identified in May later fell through. (Doc. No. 28 at ¶ 109.)

financial background.  (Doc. No. 28 at ¶ 110.)  Moreover, she informed Jenkins that she would

not be eligible for an ED/NHA position at WEL then or in the future.  (*Id.*; *see also* Doc. No. 26-

13 at 181:4–11 (Petty testifying that it was "highly unlikely" that Jenkins was going to be an

ED/NHA at WEL at any point in time).)

The Doylestown ED/NHA position ultimately remained open for five months.  During

that time, 63 individuals applied.  (Doc. No. 28 at ¶ 113.)  Jenkins, who submitted her

application in May 2021, was the 29th person to apply and the only internal candidate.  (*Id.* at ¶¶

95, 96.)  Lynne Dukert, the white female applicant who was ultimately hired, applied for the

position on August 13, 2021, and did not have her Pennsylvania NHA license at the time of her

application or by the time she began working at WEL.  (*Id.* at ¶¶ 113, 114.)  When Dukert started

as an ED, WEL hired a separate individual to work as an interim NHA until Dukert obtained her

NHA license in February 2022.[21]  (*Id.* at ¶¶ 117–19.)

### C.      Jenkins's Performance Improvement Plan

Throughout the summer of 2021, while WEL was still in search of an ED/NHA candidate

for the Doylestown community, Beiler and Lamoreux began—for the first time—to give her

negative feedback for her performance.

First, on May 20, 2021, four days after Jenkins applied for the ED/NHA position, Beiler

testified that he began a "note to file" with the subject line, "Yolanda."[22]  (Doc. No. 26-7 at

179:5–15.)  He testified that he created this document because concerns regarding Jenkins's

---

[21] WEL paid Dukert her full-time salary while also paying the interim NHA $85/hour.  (Doc. No. 28 at
¶ 123.)

[22] Beiler testified that he was unaware Jenkins applied for the ED/NHA position.  (Doc. No. 26-7 at
125:13–24.)  Rather, Beiler stated he learned that Jenkins wanted to obtain an NHA job outside of WEL,
so he introduced her to an outside recruiter.  (*Id.* at 228:6–10, 233:19–234:10; Doc. No. 34.)

leadership were "starting to bubble up," so Beiler felt the need to keep a written list.  (*Id.* at 202:6–11.)  He continued adding to the document in June 2021, including comments about Jenkins's alleged lack of involvement with the team, her communication style, her overuse of her assistant, and her allegedly condescending attitude.[23]  (*Id.* at 180:11–19, 185:1–7.)  Beiler claimed that he previously had discussed some of the concerns with Jenkins but at this time he was trying to gather information and not make "an immediate knee jerk reaction."  (*Id.* at 186:7–187:12, 215:12–21.)

Beiler could not recall when he raised these concerns about Jenkins with Lamoreux, but testified that he spoke with Lamoreux in July 2021 after Jenkins complained to Lamoreux that Kathy Baptiste, the Personal Care Administrator, was not following HR policies.  (*Id.* at 239:22–240:3, 244:11–246:20; Doc. No. 26-31 at 2; Doc. No. 26-4 at 172:4–9.)  In turn, Baptiste complained about Jenkins to both Lamoreux and Beiler, and Lamoreux began an investigation in late July.[24]  (Doc. No. 26-4 at 172:4–10; Doc. No. 26-12 at 326:9–19; Doc. No. 26-31 at 2.)

Following Lamoreux's investigation, which involved several interviews of other WEL employees and was conducted while Jenkins was away on her honeymoon (Doc. No. 26-12 at 327:17–328:2), Lamoreux placed Jenkins on a Performance Improvement Plan ("PIP") on August 11, 2021.  (Doc. No. 26-31; Doc. No. 26-12 at 328:20–329:8; Doc. No. 28 at ¶ 133.)  Jenkins was required to fix the issues addressed in the PIP within 60 days or face termination.  (Doc. No. 26-31.)  Once placed on the PIP, Jenkins was no longer eligible for any promotion,

---

[23] Despite Beiler's concerns, on June 8, 2021, Beiler agreed to be a reference for Jenkins.  (Doc. No. 34 (email to outside recruiter stating "[Jenkins] is the HR Manager I told you about who is interested in an NHA job in a not-for-profit.  I'll be her first reference 😊").)

[24] Around this time, Beiler sent Jenkins a letter congratulating her on four years at Stapeley and thanking her for her contributions to the work environment.  (Doc. No. 26-7 at 221:2–222:16.)

including the ED/NHA position for which she had already applied and for which WEL was still actively searching for a candidate.  (*Id.*; Doc. No. 28 at ¶ 113; Doc. No. 26-17.)  Lamoreux admitted she knew this was a consequence of Jenkins being placed on the PIP.  (Doc. No. 28 at ¶ 139; Doc. No. 26-31.)

Jenkins alleges that none of the allegations in the PIP were discussed with her beforehand, and she had never received any previous warnings or disciplinary notices; she was also Lamoreux's only direct report who received a PIP.  (Doc. No. 26-4 at 177:15–17; Doc. No. 28 at ¶¶ 132, 134.)  The "common theme" concerns detailed in her PIP allege:

- She was not available to the leadership and employees, since she remains in her office, is out of touch with employees, and her office door is closed more than open;

- She was not a resource to the leadership team and the leadership team no longer goes to Jenkins for HR support unless absolutely necessary;

- She had poor communication style with her peers, with specific concerns listed such as communication in a condescending manner, "believes she is always right" and "continually talks (rambles) and is unclear"; and,

- She was unprofessional because her use of speaker phone allowed others to hear HR conversations and she failed to follow the Appearance policy by wearing mule style open back shoes and plunging necklines or large V-neck blouses/shirts.

(Doc. No. 26-31 at 2–3.)

Contrary to these concerns detailed in Jenkins's PIP, Kuhn testified that she got along with Jenkins while she was employed at WEL, thought Jenkins was pleasant when they spoke, and did not find her to be condescending.  (Doc. No. 28 at ¶ 144.)  Additionally, she testified that

she found Jenkins to be truthful, professional, good at her job from what she observed, and found the way she dressed to be presentable.  (*Id*.)

Jenkins testified that upon receipt of the PIP, she felt humiliated and embarrassed.  (*Id.* at ¶ 145.)  On August 13, 2021, Jenkins sent Lamoreux and Beiler her letter of resignation and her rebuttal to her PIP, arguing, among other things, that the PIP was subjective and baseless.  (Doc. No. 26-32; Doc. No. 28 at ¶ 147.)[25]  Jenkins's last day of employment at WEL was September 10, 2021.  (Doc. No. 28 at ¶ 151.)

### D.    Procedural History

Jenkins filed a complaint on or about November 10, 2021 with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission; on March 8, 2023, she was issued a right-to-sue letter from the EEOC.  (Doc. No. 1 at ¶¶ 18, 19.) On May 23, 2023, Jenkins filed this action, alleging unlawful race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981" or "§ 1981"); the Pennsylvania Human Relations Act, 43 P.S. § 951 ("PHRA"); and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 ("PFPO").  (Doc. No. 1.)  In particular, she brings race discrimination claims based on three separate incidents:  (1) the failure to promote to the Main Line ED/NHA position in 2019[26]; (2) the failure to promote to the Doylestown ED/NHA position in 2021; and (3) the issuance of the PIP in 2021.  (*Id*.)  Additionally, Jenkins brings a hostile work environment claim based in part on Lamoreux's different and worse treatment of her following her 2018 annual

---

[25] Jenkins also separately emailed a copy of her rebuttal and resignation to Petty.  (*See* Doc. No. 26-13 at 243:14–244:9.)

[26] Jenkins only brings this 2019 failure to promote claim under § 1981, and not under Title VII, the PHRA, or PFPO.  (Doc. No. 26 at 10 n.1.)

performance review, Lamoreux's failure to provide 2020 and 2021 performance reviews, Lamoreux's failure to attend monthly one-on-one meetings with Jenkins, and Lamoreux's issuance of Jenkins's PIP.  (*Id.*)

On February 29, 2024, Defendants filed for summary judgment on all counts except Jenkins's racial discrimination based on the PIP.[27]  (Doc. No. 25.)  Defendants' motion also argues that Jenkins is not entitled to proceed on a claim of constructive discharge.  (Doc. No. 25-1 at 24–25.)  However, because Jenkins did not respond to this argument in her opposition to the Motion, her claim of constructive discharge, if any, is abandoned.  (*See* Draft Hr'g Tr. at 31:4–12 (Jenkins's counsel agreeing that Jenkins is not pursuing a constructive discharge claim)); *cf. McCowan v. City of Philadelphia*, 603 F. Supp. 3d 171, 193 (E.D. Pa. 2022) (collecting cases supporting the proposition that a plaintiff's failure to address the substance of particular claims in opposition to a motion for summary judgment constitutes abandonment of those causes of

---

[27] Although Defendants argue that they did in fact move for summary judgment on Jenkins's claim that the PIP was a discrete act of discrimination, the only reference to the PIP in Defendants' motion is in the portion addressing Jenkins's hostile work environment claim.  (*See* Doc. No. 25-1 at 23–24.)  At no point in their affirmative motion do Defendants separately analyze the PIP as a standalone discrimination claim. Thus, Defendants failed to move on the PIP claim and the Court does not address it further.  (*See* Doc. No. 1 at ¶¶ 65–73 (complaint alleging facts regarding PIP and race discrimination)); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"); *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)) ("An issue is waived unless a party raises it in its opening brief"); *cf. Bond v. Wells Fargo Bank NA*, No. CV-21-00830-PHX-JJT, 2022 WL 1423583, at *2 (D. Ariz. May 5, 2022) ("Plaintiff also alleges that because of her negative performance review, she was put on a Performance Improvement Plan (PIP).  This is also a discrete act that must be filed with the EEOC before filing a federal court action because it is an 'incident of discrimination' or a 'retaliatory adverse employment decision' constituting a 'separate actionable unlawful employment practice.'") (citation omitted) (cleaned up); *Khan v. Holder*, 37 F. Supp. 3d 213, 226–31 (D.D.C. 2014) (analyzing the defendant's decision to place the plaintiff on a PIP as a standalone Title VII claim); *Maze v. Towers Watson Am., LLC*, No. 11 C 8120, 2012 WL 568683, at *4 (N.D. Ill. Feb. 21, 2012) (citing *Morgan*, 536 U.S. at 114) ("Because the charge was untimely as to her termination, it was likewise untimely as to any discrete events of discrimination preceding it. . . . As such, Maze's complaints regarding the PIP, the reassignment of work, being denied training opportunities, etc., are time-barred.").

action).  Thus, the claims at issue are Jenkins's failure to promote claims for the ED/NHA

positions in 2019 and 2021, and the hostile work environment claim.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the "materials in the record," show that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable

jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the

outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the

judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  *Id.* at 249.  And at "summary judgment the

inferences to be drawn from the underlying facts must be viewed in the light most favorable to

the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he

burden on the moving party may be discharged by 'showing' — that is, pointing out to the

district court — that there is an absence of evidence to support the nonmoving party's case.").

After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## III.    ANALYSIS

As discussed, the remaining issues before the Court on summary judgment are: (1) Jenkins's § 1981 racial discrimination claim for Defendants' failure to promote her to the ED/NHA position in 2019; (2) Jenkins's racial discrimination claim for Defendants' failure to promote her to the ED/NHA position in 2021; and (3) Jenkins's hostile work environment claim.[28]   The Court addresses each in turn.

### A.    2019 Failure to Promote

First, Jenkins argues that Defendants' failure to promote her to the ED/NHA position at WEL's Main Line facility in 2019, instead elevating Michael DeStefon, a white employee,

---

[28] To reiterate, Defendants did not move for summary judgment on Jenkins's claim for race discrimination based on the PIP alone; thus, this claim is not considered by the Court on summary judgment.  *See supra* n.27.

constitutes racial discrimination under § 1981.  (*See* Doc. No. 1.)  Defendants argue that Jenkins

failed to establish her case on the merits and that her 2019 claim is barred by the statute of

limitations.  (Doc. No. 25-1 at 15–16, 19–22; Doc. No. 28-1 at 11–14.)  In particular, Defendants

argue that Jenkins's 2019 failure to promote claim is subject to a 2-year statute of limitations

under Pennsylvania state law, and that this claim is therefore time-barred since Jenkins brought

suit in 2023.  (Doc. Nos. 1, 25-1 at 15–16.)  Conversely, Jenkins argues that her § 1981 claim is

subject to a 4-year statute of limitations, citing 28 U.S.C. § 1658, which established a 4-year

statute of limitations for all causes of action arising under federal statutes.  (Doc. No. 26 at 15–

17.)

       Because 42 U.S.C. § 1981 does not have its own independent statute of limitations,

federal courts have generally used an analogous state equivalent, which in Pennsylvania is two

years for personal injury actions.  42 Pa. Code § 5524; *Goodman v. Lukens Steel Co.*, 482 U.S.

656, 664 (1987); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 462 (1975) ("Since there is

no specifically stated or otherwise relevant federal statute of limitations for a cause of action

under § 1981, the controlling period would ordinarily be the most appropriate one provided by

state law.").  However, in 1990, Congress enacted a 4-year catch-all statute of limitations for all

causes of action arising under federal statutes.  *See* 28 U.S.C. § 1658.  "[A] cause of action arises

under an Act of Congress enacted after December 1, 1990—and therefore is governed by

§ 1658's 4–year statute of limitations—if the plaintiff's claim against the defendant was made

possible by a post–1990 enactment."  *Jones v R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382

(2004).  Therefore, if Jenkins's discrimination claim was made possible by a federal statute

enacted after December 1, 1990, the 4-year statute of limitations applies; otherwise, the 2-year

statute of limitations applies.

42 U.S.C. § 1981(a) provides that all persons shall have the same right to make and enforce contracts.  In 1989, the Supreme Court held that causes of action could be brought under § 1981 only for discrimination that occurred during contract formation and not for post-formation conduct, such as promotions, *unless* "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employee."  *Patterson v. McLean Credit Union*, 491 U.S. 164, 179–80, 185 (1989).  The Court specified that "[o]nly where the promotion rises to the level of an opportunity for a *new and distinct relation* between the employee and the employer is such a claim actionable under § 1981."  *Id.* at 185 (emphasis added).  The Supreme Court's holding in *Patterson* prompted Congress to amend the statute in 1991—after § 1658 had established the 4-year statute of limitations—to define "make and enforce contracts" as including the "making, performance, modification, and termination of contracts," which would cover promotions that do not create a new and distinct relation.  42 U.S.C. § 1981(b); *Jones*, 541 U.S. at 373.  Thus, under this framework, Jenkins's 2019 failure to promote claim is subject to a 2-year statute of limitations (and subsequently time-barred) if the denied promotion would have created an "opportunity for a new and distinct relation between the employee and the employer," *Patterson*, 491 U.S. at 185, but is covered by § 1658's 4-year statute of limitations if her claim is "made possible by" § 1981(b)—in other words, involved modification of the same contract and did not create a new and distinct relation with the employer.  42. U.S.C. § 1981(b); *Jones*, 541 U.S. at 382 (internal citations omitted).

Whether a promotion rises to the level of a "new and distinct" relationship between the employee and employer is a fact-specific inquiry that "embodies no single criterion."  *Brown v. Am. Food Serv. Corp.*, Civ. A. No. 89-4442, 1990 U.S. Dist. LEXIS 1214, at *1 (E.D. Pa. Feb. 6, 1990).  "It comprehends all relevant factors, including pay, duties, responsibilities, status as

21

hourly or salaried employee, method of calculating salary, required qualifications, daily duties, potential liability, and pension and other benefits.  Higher pay, by itself, will not transform a promotion into a new and distinct relation." *Id.*

Courts typically hold that a promotion involving a "qualitative" change, such as increased supervisory status or greater responsibilities, constitutes a "new and distinct" relationship; conversely, a promotion that would have been routinely awarded upon satisfactory job performance, or is merely a new "rung" on the same "career ladder," does not constitute a "new and distinct" relationship.  *Cross v. Home Depot*, 390 F.3d 1283, 1289–90 (10th Cir. 2004) ("[A] court should look to whether there exists a meaningful, qualitative change in the contractual relationship.  We do not confine our inquiry to titles, but should examine actual changes in responsibility and status.  Such changes in the contractual relationship could include promotions from nonsupervisory to supervisory positions and advancements from being paid by the hour to being a salaried employee."); *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1411 (2d Cir. 1993) ("[T]he inquiry is whether a promotion effectively creates a new contract between employer and employee or is simply the fulfillment of a stated promise or an implicit expectation in the original contract."); *Fonteneux v. Shell Oil Co.*, 289 F. App'x 695, 699 (5th Cir. 2008) ("[A] non-routine promotion that involves the attainment of supervisory status may be categorized as creating a new and distinct relationship."); *Barclay v. First Nat'l Bank of Talladega*, 558 F. Supp. 3d 1156, 1164 (N.D. Ala. 2016) (collecting cases that addition of supervisory duties can create a new and distinct relation).  *Compare Fitzgerald v. AMTRAK*, No. 13-6979, 2016 U.S. Dist. LEXIS 91114, at *25 (E.D. Pa. July 13, 2016) (holding that the promotion from mechanic, inspector and foreman to Assistant Supervisor constituted a new and distinct relation because the change would have resulted in "new and greater responsibilities," a

22

"change in the chain of authority," and would have been governed by a new collective bargaining agreement) *and Mallory v. Booth Refrig. Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989) (holding that a promotion from clerk to supervisor constituted a new and distinct relationship) *and Barclay*, 558 F. Supp. at 1158 (holding that promotion from Assistant Manager of Data Processing to Bookkeeping Supervisor was a new and distinct relationship because it involved new supervisory duties, elevated the plaintiff from a non-management to a management position, and was "a sizable step up the management ladder"), *with Bennun v. Rutgers State Univ.*, 941 F.2d 154, 170 (3d Cir. 1991) (holding that promotion from tenured associate professor to full professor does not create a new and distinct relationship because the differences in duties between the two academic ranks, such as participation in the review of candidates for promotion to full professor, are too small for the creation of a new contract) *and Bryant v. Jones*, 696 F. Supp. 2d 1313, 1322 (N.D. Ga. 2010) (holding that a promotion did not create a "new and distinct" relationship between the employer and employee because although the promotion involved a change from the merit system to the non-merit system, the comparison of the jobs revealed nearly identical responsibilities). *Cf. Cross*, 390 F.3d at 1289–90 (holding that promotion from Assistant Store Manager to Store Manager did not constitute new contract because although Store Managers supervise 150-250 employees, as opposed to the assistant manager's supervision of 2 employees, the qualifications and duties for each job are essentially identical).

Turning to the positions at issue, the Court holds that the promotion from HR Manager to ED/NHA would constitute a new and distinct relationship between the Defendants and Jenkins because the elevation to the ED/NHA role was a non-routine promotion that required a new

professional license and would have resulted in the attainment of increased supervisory status and qualitative changes in the employee's responsibilities.

First, in her role as HR Manager, Jenkins reported to Lamoreux, the Vice President of Human Potential, and had a "dotted line" relationship to Beiler, the ED/NHA of the Stapeley community at WEL.  (Doc. No. 28 at ¶¶ 17, 18.)  Although the Court can theoretically imagine a scenario where Jenkins could be promoted in routine course to Lamoreux's position, Beiler's ED/NHA position, let alone an ED/NHA position at a different WEL community, would not be just another "rung" on the usual "career ladder" that Jenkins would have been awarded "routinely upon satisfactory job performance." *Butts*, 990 F.2d at 1412.  This difference in the HR Manager position and ED/NHA position is exemplified by the fact that Jenkins would have to obtain a new professional license, the Pennsylvania NHA license, which was not required for her current role or any other HR role.  (*See* Doc. No. 26-10 at 5; Doc. No. 26-7 at 129:18–21.)

More importantly, the Court finds that the ED/NHA position involved new and greater responsibilities, including, among many others, collaborating with the CEO and Finance Department to prepare annual operating and capital budgets; assuming responsibility for the overall operation of the Health Care Center to ensure full compliance with applicable licensing requirements; developing ongoing marketing strategies; and meeting with residents individually and collectively to interpret policies, maintain positive relationships, and address any concerns. (Doc. No. 26-16; *see also* Doc. No. 26-7 at 47:10–23, 55:16–57:16, 123:5–20 (Beiler testifying that as an ED/NHA he is responsible for oversight of multiple levels of care and overseeing nursing home administration).)  Conversely, the HR Manager is responsible for duties such as providing guidance to supervisors and managers in resolving employee relations issues; recommending appropriate corrective action for behavior and performance improvements;

coordinating recruitment activities and reviewing employment applications; representing the community at Unemployment Hearing and Workers Compensation; and ensuring compliance with applicable labor and employment laws.  (Doc. No. 26-10 at 2.)  And, whereas Jenkins in her role as HR Manager supervised one person (Doc. No. 26-4 at 59:6–21), the ED/NHA is responsible for many other employees (*see, e.g.*, Doc. No. 26-7 at 53:23–54:4, 75:18–76:7 (Beiler testifying that he has nine employees who directly report to him); Doc. No. 26-12 at 82:10–19 (Lamoreux testifying that an ED/NHA at WEL oversees not only the nursing home, but also "assisted living . . . the ancillary departments surrounding that community, independent living, budgeting . . . dining, environmental services such as housekeeping, maintenance, activities, [and] therapy")); Draft Hr'g Tr. at 9:1–13 (Defendants' counsel explaining that the ED/NHA is responsible for all nine department heads within each community)).  Although Jenkins emphasizes that Defendants admitted that the ED/NHA and HR Manager roles have some overlapping responsibilities, such as administering approved HR policies and directives, participating in selection and employment of department heads, and being accountable for growth of performance management of community employees (Doc. No. 29 at 5–6), the Court finds that these minor similarities cannot overcome the chasm which exists between the two roles.

Thus, the Court finds that the promotion to the ED/NHA role at the Main Line facility would have constituted a "new and distinct" relationship between Defendants and Jenkins, and therefore Jenkins's claim based on the Defendants' failure to promote her to that position would have been a valid claim under the pre-1991 enactment of § 1981.  In turn, the 2-year statute of limitations applies, and the Court holds that Jenkins's 2019 failure to promote claim is time-barred.

**B.     2021 Failure to Promote**

Jenkins also alleges race discrimination for Defendants' failure to promote her to the ED/NHA position at WEL's Doylestown facility in 2021.  (*See* Doc. No. 1.)  Because the Court finds that disputes of fact exist, the Court denies Defendants' motion for summary judgment as to this claim.

Jenkins's race discrimination claim is governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Analysis under this framework proceeds in three steps.  *Opsatnik v. Norfolk S. Co*., 335 F. App'x 220, 222 (3d Cir. 2009).  "First, the plaintiff must establish a prima facie case of discrimination."  *Jones v. Sch. Dist. of Phila*., 198 F.3d 403, 410 (3d Cir. 1999).  If the plaintiff carries her burden, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action.  *Id.* at 410–11 (quoting *McDonnell Douglas Corp*., 411 U.S. at 802).  "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).

Defendants argue that Jenkins's claim fails on multiple fronts, attacking both Jenkins's prima facie case and arguing that Jenkins is unable to prove that Defendants' failure to promote was pretextual.  (Doc. No. 25-1 at 19–22.)  Defendants argue that WEL had a legitimate, nondiscriminatory reason for not hiring Jenkins—namely, that Petty prioritized someone with more and *recent* executive director experience, rather than someone who merely had an NHA license.  (*Id.* at 20, 22.)  Jenkins disagrees, arguing that she clearly established a prima facie case

and that Defendants' legitimate, nondiscriminatory reason was pretextual.  (Doc. No. 26 at 18–31.)

The Court agrees with Jenkins, finding first that Jenkins has satisfied her prima facie case of racial discrimination, before turning to her showing of pretext.

### 1.    Prima Facie Case

The Court finds that Jenkins has satisfied her prima facie case of racial discrimination for her 2021 failure to promote claim.  To establish a prima facie case of racial discrimination based on disparate treatment, a plaintiff must show that:  (1) she is a member of a protected class, (2) she was qualified for her position, and (3) she suffered an adverse employment action, (4) under circumstances giving rise to an inference of intentional discrimination.  *Jones*, 198 F.3d at 410–11; *see also Wallace v. Federated Dep't Stores, Inc*., 214 F. App'x 142, 144–45 (3d Cir. 2007) (framing the fourth element as requiring evidence that "either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise to an inference of discrimination").  There is a low bar to establish a prima facie case of employment discrimination.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).  Here, it is undisputed that Jenkins is a member of a protected class and that she suffered an adverse employment action when she was not promoted.  Thus, only the second and fourth prongs of the prima facie case remain.

As to the second prong, although Defendants argue that Jenkins was not qualified for the ED/NHA position because she did not have recent experience or enough experience as an Executive Director at a CCRC (Doc. No. 25-1 at 20), the ED/NHA role description which was posted publicly did not include such a requirement.  (*See* Doc. No. 26-16.)  Instead, the ED/NHA job posting included the following "[q]ualifications":  (1) "Related Experience" which included,

among other similar items, "[s]uccessful implementation of redesign of program operations, strategic planning, expansion of services, and/or development of service models within a Personal Care/Assisted Living, SNF, or CCRC model," (2) a college degree, and (3) a Pennsylvania NHA license, with master's degree in a related field preferred.[29]  (*Id.*)  Here, the evidence demonstrates that Jenkins had her Pennsylvania NHA license, a college degree in human resources management, a master's degree in human resources development, and several years of experience overseeing and managing CCRCs before joining WEL, satisfying the basic qualifications listed in the job posting.  (Doc. No. 28 at ¶¶ 1, 3,7, 8, 11; Doc. No. 26-13 at 111:18–112:14).  Thus, because the Court considers only whether a plaintiff possessed the objective job qualifications at the prima facie stage, rather than any "subjective" qualities such as degree of experience, the Court holds that Jenkins was qualified for this position.  *See Weldon v. Kraft, Inc.*, 898 F.2d 793, 798 (3d Cir. 1990) ("[W]hile objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the *McDonnell Douglas* analysis.  We noted that subjective evaluations 'are more susceptible of abuse and more likely to mask pretext.'" (quoting *Fowle v. C & C Cola*, 868 F.2d 59, 64-65 (3d Cir. 1989)); *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 589 (E.D. Pa. 2013) ("When evaluating the plaintiff's prima facie case, courts should consider a plaintiff's objective job qualifications, but should leave the question of whether an employee possesses a subjective quality, such as leadership or management skill, to the later stage of the *McDonnell Douglas* analysis." (quotation marks omitted) (cleaned up)).

---

[29] The Qualifications section of the ED/NHA job post also listed a number of interpersonal skills, such as "Organizational development and leadership skills."  (Doc. No. 26-16.)

That leaves the fourth prong.  The Court holds that Jenkins has demonstrated circumstances giving rise to an inference of intentional discrimination.  Defendants' argument that the case at bar "obviously" does not give rise to an inference of discrimination because Jenkins did not complain at the time that she was not promoted to the ED/NHA position is not persuasive.  (Doc. No. 25-1 at 20.)  The Court finds that the following facts support an inference of intentional race discrimination:  Petty and Lamoreux were both on notice for multiple years that Jenkins was interested in an ED/NHA position (Doc. No. 28 at ¶¶ 25, 64); upon notice that Jenkins had applied for the open position in 2021, Lamoreux informed Jenkins that she had applied too late, and did not recall taking any steps to discuss interviewing Plaintiff for the position with Petty (Doc. No. 26-24 at 2, Doc. No. 28 at ¶ 109); the white applicant who was eventually chosen for the position applied three months after Jenkins applied (Doc. No. 28 at ¶ 113); and the white applicant did not possess an NHA license at the time she was hired, although the job position listed "NHA license" as an objective qualification (Doc. No. 28 at ¶ 114, Doc. No. 26-16).  The Court finds that these facts, taken together, easily establish a prima facie inference of race discrimination, which as noted above, is a low bar.  *Scheidemantle*, 470 F.3d at 539.  Furthermore, the Court also takes note that there has been minimal diversity in managerial or executive-level positions at WEL, and there have only been white ED/NHAs employed at WEL since Petty joined as CEO of WEL in 2003.  *See Castillo v. Am. Bd. of Surgery*, 221 F. Supp. 2d 563, 570 ("[P]laintiffs in a disparate treatment case may [] introduce statistical evidence to support an inference of discrimination.") (citations omitted); *cf. Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 542 (3d Cir. 1992) ("Statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext.").

## 2. Defendants' Legitimate, Nondiscriminatory Justification and Pretext

Defendants next argue that we should dismiss Jenkins's 2021 race discrimination claim because she failed to demonstrate that Defendants' legitimate, nondiscriminatory reason for not promoting her was pretextual.  To reiterate, if the defendant carries its burden of demonstrating a legitimate non-discriminatory reason, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410–11.  To demonstrate pretext, a plaintiff must point "to some evidence, direct or circumstantial, from which a factfinder would reasonably either:  (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 412–13.  (quoting *Fuentes v. Perski*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000) ("The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Defendants assert that Jenkins was not selected for the Doylestown ED/NHA position because she did not have enough, recent ED experience.  (Doc. No. 25-1 at 21–22; Doc. No. 28-1 at 8.)  They argue that Jenkins cannot demonstrate that this legitimate reason was pretextual because "[t]hroughout the process, WEL was very clear that they were pursuing a candidate with recent executive director experience, not someone who had not done that job since 2005."  (Doc. No. 25-1 at 22.)  Yet, as Jenkins argues, the Court discerns a number of apparent factual disputes, questions of credibility, and evidence from which a factfinder could disbelieve Defendants' articulated legitimate reason, prohibiting entry of summary judgment.

First, Petty, who was the ultimate decisionmaker for the ED/NHA role (Doc. No. 28 at ¶ 22), testified that he did not seriously consider Jenkins as an applicant because he believed Jenkins could not lead people, did not have a business sense, and could not communicate effectively.  (Doc. No. 26-13 at 94:18–95:4, 98:3–8.)  Yet, the record suggests that Jenkins and Petty had only very limited interactions.  (*See* Doc. No. 26-13 at 70:24–71:17 (Petty testifying that he did not get the chance to work with Jenkins "in great depth" and that he did not "recall much individual one-on-one interaction," but that he interacted with her when he would "routinely meet with both the HR group in the HR meetings, as well as . . .  monthly worker's compensation claim review meetings. . . . So [he] would interact with her largely as part of those group settings."); Doc. No. 26-4 at 237:5–19 (Jenkins testifying that she never had a one-on-one conversation with Petty and never had a direct conversation with Petty during group meetings); *see also supra* n.19).)  In addition, both Althea Taylor (Crockett)[30] and Cara Kuhn stated, by contrast, that they did not believe Jenkins talked too much.  (Doc. No. 28 at ¶ 62; Doc. No. 26-11 at 8:7–10; Doc. No. 30).  Still, despite these limited interactions with Jenkins, Petty testified that he formed his opinion that Jenkins was an inappropriate candidate for the ED/NHA role as early as 2018, just one year after she began working at WEL.  (Doc. No. 28 at ¶¶ 45, 46.)  A

---

[30] Although Defendants argue for the first time in their reply brief that Taylor's statement cannot be introduced to defeat the summary judgment motion because it was not dated or declared under penalty of perjury (Doc. No. 28-1 at 9–10), the Court holds that this objection is untimely.  *Laborers' Int'l Union*, 26 F.3d at 398 ("An issue is waived unless a party raises it in its opening brief").  Even if the objection was raised timely, the Court holds that Jenkins appropriately cured any deficiency with an amended filing (*see* Doc. No. 30).  *See Wiley v. Lawrence County*, No. 17-1214, 2019 U.S. Dist. LEXIS 39242, at *36 (W.D. Pa. Mar. 12, 2019) ("[T]he Court need not decide if [the] original declaration was insufficient on the basis that it was un[s]worn, because Plaintiff has resubmitted the identical declaration, on which Petyak has stated 'I declare under penalty of perjury that the foregoing is true and correct.'  This fulfills the requirements of 28 U.S.C. § 1746.") (citation omitted); *Robinson v. UPMC Presbyterian Shadyside*, 2023 U.S. Dist. LEXIS 160981, at *6 (W.D. Pa. Sept. 12, 2023) ("The Court also recognizes that . . .  Robinson could cure such procedural defects [to the form of the affidavit] by resubmitting an unsworn declaration with the appropriate language set forth in 28 U.S.C. § 1746.").

reasonable jury could believe that Petty's formation of this opinion of Jenkins so early on, after

so few interactions, and in light of Kuhn's and Taylor's contrary statements, could be more

likely than not motivated by racial discrimination.  *See Hanna v. Lincoln Fin. Grp.*, 498 F. Supp.

3d 669, 678 (E.D. Pa. 2020) ("[R]eliance on subjective criteria can be, under certain

circumstances, a mask for discrimination."); *see also Goosby v. Johnson & Johnson Med., Inc.*,

228 F.3d 313, 320 (3d Cir. 2000) ("Subjective evaluations are more susceptible of abuse and

more likely to mask pretext." (quotation marks omitted)).

Second, WEL leadership provided multiple, inconsistent reasons for why they chose not

to hire Jenkins.  Lamoreux testified that Jenkins was not hired because Petty was seeking

someone with more and recent Executive Director experience.  (Doc. No. 26-12 at 256:16–

257:22; *see also* Doc. No. 28 at ¶ 110.)  Yet, Petty promoted DeStefon to ED/NHA in 2019

knowing that he had neither prior ED experience nor an NHA license.[31]  (Doc. No. 28 at ¶ 68.)

Moreover, as discussed above, Petty, who was the ultimate decisionmaker (Doc. No. 28 at ¶ 22),

inconsistently testified that he chose not to promote Jenkins due to her speaking style and ability

to communicate.  (Doc. No. 26-13 at 94:18–95:4, 98:3–8.)  He also testified that, "even if I had

known about her previous employment, which I might have, it wouldn't have overridden my

impression of her" regarding her ability to communicate and lead people.  (*Id.* at 146:6–17.)

Last, Petty testified that Jenkins could not become an ED/NHA without first approaching him to

discuss the position (*see supra* n.18); yet, DeStefon testified that it was Petty who approached

him regarding a potential promotion to ED/NHA, and not the other way around (Doc. No. 28 at

¶¶ 67, 73, 74; Doc. No. 26-20 at 67:14–68:1, 75:5–11).  These inconsistent explanations for

---

[31] Although "we have concluded that [Jenkins's] claims against [Defendants based on the 2019 failure to promote claim is] time-barred, we may nevertheless consider them as background evidence."  *Oliver v. Clinical Pracs. Of the Univ. of Pa.*, 912 F. Supp. 2d 434, 452 n.19 (E.D. Pa. 2013) (citing *Morgan*, 536 U.S. at 113).

Jenkins's non-promotion raise a dispute of fact, and this evidence could permit a factfinder to reasonably disbelieve Defendants' articulated reasons for failing to promote Jenkins. *See Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019) (quoting *Fuentes*, 32 F.3d at 765) (holding that evidence of the employer's inconsistent explanations for the plaintiff's firing "show[] the sort of 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence'").

Third, as noted above, Lamoreux initially informed Jenkins that she applied for the job position too late (Doc. No. 26-24); yet, the white candidate who was ultimately chosen applied *months* after Jenkins applied (Doc. No. 28 at ¶ 113).  And, the white applicant who was finally chosen did not possess an NHA license at the time she was hired (*id.* at ¶ 114), even though the NHA license was listed as a qualification on the job posting (Doc. No. 26-16).

Fourth, Beiler testified that although he wrote a recommendation letter in March 2021 for Jenkins to the New Jersey Department of Nursing Home Administrators Licensing Board praising Jenkins's professionalism (Doc. No. 28 at ¶ 126; Doc. No. 26-29 ("I . . . can vouch for [Jenkins's] character, high standards both professionally and morally, and dedication to her profession. . . . I look to [Jenkins] for advice on a number of subjects, including employee relationship and job satisfaction.")), and agreed to vouch for Jenkins as a reference to an outside recruiter for an NHA position in June 2021 (*see* Doc. No. 34 ("[Jenkins] is the HR Manager I told you about who is interested in an NHA job in a not-for-profit.  I'll be her first reference 😊")), he also began compiling a list of complaints regarding Jenkins's job performance and communication with her peers on May 20, 2021 (Doc. No. 26-23 at 2; Doc. No. 26-7 at 179:5– 15, 180:11–19, 185:1–7, 202:6–11).  This was just four days after Jenkins applied to the open

ED/NHA position, suggesting a possibility that Petty, Beiler, and Lamoreux could have had conversations regarding Jenkins's application or performance. Although the Court does not make such a finding, this circumstantial evidence could permit a factfinder to reasonably disbelieve Defendants' articulated reasons for failing to promote Jenkins.

Finally, in August, Lamoreux placed Jenkins on a PIP without any warning. (Doc. No. 26-31; Doc. No. 26-7 at 184:1–185:7, 187:21–188:5.) Once issued the PIP, Jenkins was no longer eligible to be considered for the open ED/NHA position. (Doc. No. 27-17 at 2.)

Viewing the above inconsistencies in the light most favorable to Jenkins and considering the backdrop of demographic statistics for WEL's ED/NHA leaders, which demonstrate a glaring lack of diversity, the Court finds that there is sufficient circumstantial evidence to conclude that Defendants' stated legitimate reason for not promoting Jenkins could have been pretextual. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 542 (3d Cir. 1992) ("Statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext."). *Compare Brown v. Ametek, Inc.*, No. 22-1497, 2022 WL 17484330, at \*5–9 (3d Cir. Dec. 7, 2022) (reversing district court's grant of summary judgment in employment discrimination suit because the record evidence undermined the defendant's reasons for denying the promotion) *with Steele v. Pelmor Labs., Inc.*, 725 F. App'x 176, 179–81 (3d Cir. 2018) (affirming district court's grant of summary judgment of retaliation claim because the "numerous inconsistencies" set forth by the plaintiff as evidence for pretext were "minor discrepancies on immaterial issues, and they all are consistent with [the defendant's] proffered reason for [the plaintiff's] termination"). The Court finds that a jury could believe that an invidious discriminatory reason was more likely than not a motivating cause of Defendants' failure to promote. *See Paladino v. Newsome*, 885 F.3d 203, 209–10 (3d Cir. 2018) ("[I]n

considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence.") (quotation omitted).

* * *

Since the Court finds that Jenkins has satisfied her prima facie case and that there are issues of fact as to whether Defendants' legitimate, non-discriminatory reason for not promoting Jenkins is pretext for race discrimination, the Court denies Defendants' motion for summary judgment as to Jenkins's 2021 failure to promote claim.

### C.    Hostile Work Environment

Last, Defendants move for summary judgment on Jenkins's hostile work environment claim.  Jenkins argues that the record shows that after she first expressed interest in an ED/NHA position in 2018, Lamoreux began engaging in harassing behavior, including interrupting and cutting off Jenkins during monthly group discussions, unjustly criticizing her manner of speaking, missing or cancelling most of her monthly one-on-one meetings, and discontinuing her performance reviews after the year 2019.  (Doc. No. 26 at 32.)  Jenkins argues that her white HR peers were treated much better than her and did not have their monthly one-on-one meetings cancelled, citing a statement from Althea Taylor (Crockett) corroborating this treatment as support.  (*Id.* at 32–33.)  Jenkins further argues that the PIP, which she alleges contains false statements and misrepresentations, constitutes evidence of a hostile work environment.  (*Id.* at 33–34.)  For the reasons discussed below, the Court finds that the facts do not demonstrate a hostile work environment as a matter of law, and summary judgment on this claim is granted.

To state a claim for hostile work environment, a plaintiff must show:  (1) she "suffered intentional discrimination" because of her race; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected the plaintiff"; (4) "the discrimination would

35

detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of respondeat superior liability, meaning the employer is responsible." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017); *see also Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 (D.N.J. 2003) ("Reduced to its most basic components, an actionable hostile work environment requires proof that Plaintiff was subjected to a level of gender- or race-based harassment which was 'severe or pervasive' enough to create a working environment which is both subjectively and objectively abusive or hostile to female or African American employees.").

In determining whether harassment rises to the level of an actionable hostile work environment, we must consider the "totality of the circumstances . . . including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interfere[d] with an employee's work performance." *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Davis v. City of Newark*, 285 F. App'x 899, 902 (3d Cir. 2008) (same). In addition, "the advent of more sophisticated and subtle forms of discrimination requires that [a court] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 260-61 (3d Cir. 2001).

Following a thorough review of the record and drawing inferences in the light most favorable to Jenkins, the Court holds that the totality of the circumstances does not demonstrate that Jenkins was subjected to severe or pervasive harassment sufficient to sustain a hostile work environment. To create a hostile work environment, "[t]he discriminatory conduct must be extreme enough to amount to a change in the terms and conditions of employment." *Chinery v.*

36

*Am. Airlines*, 778 F. App'x 142, 145 (3d Cir. 2019) (quotation marks omitted) (cleaned up).  As

a result, "[o]rdinary tribulations of the workplace, such as the sporadic use of abusive language,

jokes, and occasional teasing are not enough to sustain a hostile work environment claim."

*Wright v. Providence Care Ctr., LLC*, No. 2:17-CV-00747-NR, 2019 U.S. Dist. LEXIS 162909,

2019 WL 4643592, at *11 (W.D. Pa. Sept. 24, 2019), *aff'd*, 822 F. App'x 85 (3d Cir. 2020).

"Unless extremely serious, offhand comments and isolated incidents are insufficient to sustain a

hostile work environment claim."  *Chinery*, 778 F. App'x at 145.  Also, "[w]ith respect to the

issue of pervasive conduct, courts in this Circuit have been steadfast in finding that 'general,

unsubstantiated allegations that the alleged conduct occurred "regularly" or "all the time"' are

insufficient to survive summary judgment."  *Joseph v. West Penn Allegheny Health Sys*., 2022

U.S. Dist. LEXIS 54737, *25-26 (W.D. Pa. Mar. 25, 2022) (quoting *Nitkin v. Main Line Health*,

No. CV 20-4825-KSM, 2021 U.S. Dist. LEXIS 201348, at *11 (E.D. Pa. Oct. 18, 2021)).

       In *Wright v. Providence Care Center*, for instance, the Third Circuit affirmed the district

court's grant of summary judgment as to the plaintiff's hostile work environment claim because

her evidence of a hostile work environment was not "objectively speaking, either sufficiently

pervasive or severe to have altered the conditions of her employment and to have created an

abusive working environment."  822 F. App'x 85, 96 (3d Cir. 2020).  The Third Circuit

emphasized that as to pervasiveness, "the record does not support [the plaintiff's] assertion that

she was subjected to harassment on a daily and weekly basis.  As the District Court aptly

observed, [the plaintiff] cites a handful of incidents that appear to have been spread out over the

course of many months."  *Id*. at 96–97.  As to severity, the Third Circuit held that nothing the

plaintiff experienced, taken individually or in the aggregate, could be objectively severe enough

to alter the conditions of her employment or to create an abusive working environment" because

"[o]ccurrences such as being ignored, told once to 'shut up,' hearing an offhand comment about collecting disability, being temporarily pulled to work on another floor at the facility, receiving a marginally negative performance review without cause, and scheduling annoyances, while no doubt unpleasant, are not objectively 'extreme.'"  *Id.* at 97.

Here, Jenkins has not demonstrated that the totality of the behavior was severe or pervasive.  First, Jenkins testified that Lamoreux interrupted her in meetings "periodically," i.e., on more than five occasions over three years.  (Doc. No. 26-4 at 102:6–104:19 (Jenkins testifying, "It may not have been at every meeting but it occurred at several of the monthly meetings. . . . [Question asking how many occurrences there were in approximately 36 monthly meetings from 2018 to 2021]  A: I cannot give you an exact number of meetings where it occurred but I can tell you it did occur periodically.  Q: Did it occur more than five times?  A: Yes, I would say more than five times. . . . I don't have a specific recollection of which meetings they occurred in.  Q: Do you have a recollection of about approximately how many times this happened?  A: Well, I can tell you it is more than five.").)  Importantly, Jenkins does not allege that these interruptions occurred constantly or that they amounted to a change in the terms and conditions of her employment.  (*See id.*)  Although she presents a statement from Taylor affirming that Lamoreux treated Jenkins harshly, Taylor only worked at WEL for a few months in 2018.  (*See* Doc. No. 26-4 at 65:14–66:4; Doc. No. 30.)

By the same token, Jenkins does not allege that missing multiple one-on-one meetings with Lamoreux amounted to a change in the terms of and conditions of her employment.  (*See* Doc. No. 26-12 at 158:13-159:7 (Lamoreux testifying that she was always available "24/7" to her managers for any issues, "[s]o even if we didn't meet [for monthly one-on-one meetings], they were able to communicate with me if there was a pending issue that maybe we needed to

talk about").)  And, although Jenkins undisputedly did not receive a performance review in 2020, Lamoreux testified that she may have missed 2020 performance reviews during the pandemic, while she was being treated for breast cancer.  (Doc. No. 26-12 at 146:16–22 (Lamoreux testifying that she wasn't meeting with people regularly during the pandemic and during her cancer treatments), 166:1–14; 262:6–10 ("Q: Do you recall providing employees with performance reviews in 2020 and 2021?  A: Not 2020.  As I said, that was the year that I was sick and COVID and I'm not sure that I did any reviews in 2020.").)  Finally, the record shows that Lamoreux was preparing a performance review in 2021 for Jenkins but put the review "on pause" because Beiler shared with Lamoreux that he had some concerns that he would like to discuss.  (Doc. No. 26-12 at 262:6–263:2.)  The record also shows the year 2021 had not concluded before Plaintiff resigned in August 2021. (*See* Doc. No. 26-32.)  These few one-off instances are neither "severe" nor "pervasive."  *See Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 546 (E.D. Pa. 2013) (holding that a few instances of workplace bullying and overtime denial was not severe and pervasive enough to sustain a hostile work environment claim); *Fitzgerald v. Glenn Ins., Inc.*, No. 1:20-CV-14891 (KMW-EAP), 2023 U.S. Dist. LEXIS 57018, at *42 (D.N.J. Mar. 31, 2023) (holding that a handful of incidents, such as lack of invitations to lunch, being interrupted when he attempted to explain his illness, being ignored, removal from a committee, and his supervisor's "explosive" reaction to the news of the plaintiff's cancer, which occurred over many months, was not objectively extreme to establish a hostile work environment); *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) ("Hambrick complains of personality issues with coworkers and supervisors.  Yet insults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance.  And having supervisors who are

39

short tempered, hostile, unfairly critical, and disrespectful, does not amount to objectively offensive, severe, or pervasive conduct." (citations omitted) (cleaned up)); *cf. Thornton v. Analog Devices, Inc.*, No. 22-cv-2392-MRP, 2023 WL 3627830, at *1–2 (E.D. Pa. May 24, 2023) (holding, where the plaintiff alleged that her supervisor *consistently* "belittled her contributions, spoke to her in a patronizing way, or simply ignored her presence," and ultimately barred the plaintiff from speaking from meetings and removed her from business discussions," that the jury could find that this constituted severe and pervasive hostile work environment) .

Finally, although she challenges its accuracy and alleges that she did not receive any prior warning, the August 2021 PIP does not does not constitute sufficiently severe or pervasive conduct, individually or when considered in the aggregate with the above behavior.[32]  *See Ciecka v. Cooper Health Sys.*, No. 15-4075 (JBS/KMW), 2017 U.S. Dist. LEXIS 20539, at *33–34 (D.N.J. Feb. 14, 2017) (rejecting the plaintiff's argument that being placed on a PIP "despite prior positive work performance evaluations and having his work closely monitored under the PIP" was sufficiently severe or pervasive so as to constitute a hostile work environment); *see also Dortch v. Cellco Partnership*, 770 F. App'x 643, 645–46 (4th Cir. 2019) (affirming district court's conclusion that the plaintiff's supervisor's investigation into the team's dissatisfaction with the plaintiff and the subsequent decision to place the plaintiff on a PIP did not create an abusive working environment); *Darbha v. Capgemini Am. Inc.*, 492 F. App'x 644, 647 (7th Cir.

---

[32] Additionally, the PIP is a facially neutral action.  Although Jenkins argues that the PIP raises an inference of intentional discrimination because a PIP was only issued to her, a black woman, Jenkins fails to show that a PIP should also have been issued to a white individual but was not.  *See Nardella v. Phila. Gas Works*, 997 F. Supp. 2d 286, 297 (E.D. Pa. 2014) ("Plaintiff has not established a nexus between these encounters and any discriminatory animus on the part of anyone at PGW.  Plaintiff argues that her being denied raises in 2007 and 2008 while on PIPs could be the result of being Caucasian and discriminated against.  It could also be the result of Jordon's dissatisfaction with Plaintiff's attitude and her performance." (internal citation and alterations omitted)).

2012) ("[T]o survive summary judgment, Darbha needs evidence of harassment so severe or pervasive that it created an abusive working environment.  An evaluation stating that Darbha's performance needed improvement does not meet this standard." (citations omitted)); *Walden v. Patient-Centered Outcomes Res. Inst.*, 177 F. Supp. 3d 336, 345 (D.D.C. 2016) ("Plaintiff's reliance on the PIP and negative performance evaluation are similarly misplaced.  Criticisms of work and expressions of disapproval (even loud expressions of disapproval) are not sufficiently severe to constitute a hostile work environment." (citations omitted) (cleaned up)); *Na'Im v. Rice*, 577 F. Supp. 2d 361, 377 (D.D.C. 2008) ("[The] alleged issuance of untimely and low performance, the plaintiff's non-selection in 2002, or her placement on the PIP in 2005 do not by themselves sustain a hostile work environment claim because these incidents are not severe as a matter of law.").

Overall, in support of her hostile work environment claim, Jenkins points only to sporadic instances of her being interrupted at meetings, that Lamoreux missed one-on-one meetings and a performance review with her during the pandemic and while she was receiving cancer treatment, that she didn't receive a performance review in 2021 before she resigned in August 2021, and a facially neutral PIP.  When viewed together, the Court cannot find that Jenkins faced sufficiently severe or pervasive discrimination such that the terms and conditions of her employment were altered.  Thus, considered under the totality of the circumstances, the Court finds that Jenkins fails to demonstrate hostile work environment as a matter of law, and grants Defendants' motion as to this claim.  *See Foroozesh v. Lockheed Martin Operations Support, Inc.*, 2:03cv1703, 2006 U.S. Dist. LEXIS 12789, at *41–42 (W.D. Pa. Mar. 24, 2006) ("Three e-mails over the course of a month which relate specifically to Plaintiff's work performance and which have no apparent connection to Plaintiff's sex or national origin,

combined with a sex-neutral and national origin-neutral performance improvement plan, do not amount to severe or pervasive discrimination based on sex or national origin."); *Lassair v. Wilkie*, No. 2:17-01638-RAJ, 2019 U.S. Dist. LEXIS 179345, at *19–20 (W.D. Wash. Oct. 16, 2019) ("Ms. Lassair's allegations that she was denied training, her production goals were changed, she received written counseling and was placed on a PIP, and her promotion was delayed by three months, do not establish a pattern of related discriminatory conduct sufficiently severe to support a hostile work environment claim. . . . Ms. Lassair's hostile work environment claim is not saved by her general assertion that her coworkers joked about her age or Ms. Crawford's statements that in 2009, Mr. Dick made comments about her age.  Although offensive, such comments are not sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." (internal citations omitted)).

## IV.    CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment as to Jenkins's 2019 failure to promote racial discrimination claim and as to her hostile work environment claim, but denies the motion as to Jenkins's 2021 failure to promote racial discrimination claim.  An appropriate Order follows.